UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DENNIS KYRSTEK, Individually ) <br> And on Behalf of All Others Similarly ) <br> Situated, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> RUBY TUESDAY, INC., JAMES J. ) <br> BUETTGEN, MICHAEL O. MOORE, ) <br> And KIMBERLY S. GRANT, ) <br> ) <br> Defendants. ) | No. 3:14-cv-01119 <br><br> Judge Sharp <br> Magistrate Judge Knowles |

**MEMORANDUM**

Pending before the Court are Defendants' Motion to Dismiss the Consolidated Complaint (Docket No. 43) and Plaintiffs' Motion to Strike (Docket No. 51). For the reasons stated herein, Plaintiffs' Motion will be denied as moot and Defendants' Motion will be granted in part and denied in part.

**I.   FACTS**

Named Plaintiff Dennis Krystek and Lead Plaintiff Alaska Electrical Pension Fund (collectively "Plaintiffs") purchased Ruby Tuesday common stock during the Class Period, which ran from April 10, 2013 until October 10, 2013. Plaintiffs have filed suit on behalf of themselves and others who are similarly situated ("the Class") against Defendant Ruby Tuesday, Inc. ("Ruby Tuesday" or "the Company"), which operates the restaurant chains Ruby Tuesday and Lime Fresh.[1] Plaintiffs also name as Defendants the following individuals: James J. Buettgen, President and CEO of Ruby Tuesday; Michael O. Moore, Executive Vice President

---

[1] Ruby Tuesday, Inc. purchased Lime Fresh in April 2012.

1

and Chief Financial Officer of Ruby Tuesday; and Kimberly S. Grant, former Chief Operations Officer of Ruby Tuesday (collectively "the Individual Defendants").

Plaintiffs allege that during the Class Period Defendants engaged in a scheme to fraudulently: 1) overstate progress toward Ruby Tuesday's brand repositioning; and 2) conceal the poor performance of Lime Fresh restaurants. Plaintiffs' specific assertions are that Defendants made false statements in the spring and summer of 2013 indicating that the Ruby Tuesday restaurant repositioning plan was under way and having a positive impact on restaurant performance. In so doing, Plaintiffs allege, Defendants kept stock prices artificially high even while same-restaurant sales at Ruby Tuesday restaurants fell. Plaintiffs also allege that Defendants touted Lime Fresh as an exciting restaurant concept with the potential to create future value when, in reality, Lime Fresh was a financial liability to the Company. Plaintiffs assert that subsequent disclosures regarding the true progress toward repositioning—or rather, the lack thereof—and regarding Lime Fresh's negative margins led to a collapse in stock price, damaging the Plaintiffs. Plaintiffs seek a declaration of this action as a proper class action pursuant to Federal Rule of Civil Procedure 23, class damages, reasonable costs and attorney's fees, and injunctive or other equitable relief.

The Class Period begins on April 10, 2013, when Defendants allegedly made false and misleading statements and omissions in the Third Quarter 2013 Earnings Press Release ("Q3 2013 Press Release") and the corresponding conference call with investors ("Q3 2013 Earnings Call"). During the call, Defendant Buettgen informed investors that the Company's previous efforts to transition Ruby Tuesday restaurants into a high-end chain had not been successful. He announced a "long-term" plan to reposition the Ruby Tuesday restaurant brand "toward a more casual and approachable positioning" that would appeal "to a broader guest demographic."

(Docket No. 45-6 at 2). Defendant Buettgen also touched on decisions made in the Second Quarter 2013 to close all non-core concepts except Lime Fresh, which he acknowledged as a brand still in its "infancy" but with a lot of "potential." (Id.). Defendant Moore provided details about the Company's Q3 2013 performance and Greg Ashley, Vice President of Finance, summarized the Company's guidance for the rest of the fiscal year.

Plaintiffs' allegations concern both statements regarding the Ruby Tuesday restaurant repositioning plan and statements and omissions regarding Lime Fresh's potential and performance. Plaintiffs set forth the allegedly false and/or misleading statements relating to the repositioning plan in Paragraphs 60 to 66 of the Consolidated Complaint. Specifically, Plaintiffs point to:

- Defendant Buettgen's statement in the Q3 2013 Press Release that Defendants were "pleased with the progress" on repositioning the brand "toward a more mainstream, lively, and approachable position" and that the Company had "already introduced a handful of new menu items." (Docket No. 40 at ¶ 60).

- Statements in the Q3 2013 Earnings Call regarding the income from continuing operations and regarding the diluted earnings per share for Q3 2013. (Id. at ¶ 61).

- Predictions in the Q3 2013 Earnings Call that for Fiscal Year 2013, same-restaurant sales would remain flat, operating margins would improve by approximately 100 basis points, and diluted earnings per share would be $0.18 to $0.22 from continuing operations or, excluding certain expenses, $0.28 to $0.32. (Id. at ¶ 61).

- A statement in the Q3 2013 Press Release that the Company had more than $9 million of goodwill and $68 million in other assets. (Id. at ¶ 62).

- Defendant Buettgen's statement in the Q3 2013 Earnings Call that, "[d]uring the quarter, we made good progress on a number of key initiatives, which we believe, over the long term, will get the Company back to the positive sales and earnings performance we realized several years ago. . . . During the quarter, we made good progress in beginning to position our brand as an approachable, every-day dining option, with our key areas of focus being food and beverage offerings, menu and merchandising material design, and our television advertising." (Id. at ¶ 63).

- Defendant Grant's statement in the Q3 2013 Earnings Call that guest satisfaction scores "show improvement over the prior year" and that these scores "continue to be

3

the best in the Bar and Grill category, and at parity in many other categories within the Specialty Restaurant segment." (Id. at ¶ 64).

- Defendant Moore's statement in the Q3 2013 Earnings Call that although same restaurant sales were down 2.8% for the quarter, guest counts improved and got better "sequentially" nearing "the end of the quarter." (Id. at ¶ 65).

- Defendant Buettgen's statement in the Q3 2013 Earnings Call that the Company's guidance implied performance that was "essentially flat for the quarter." (Id. at ¶ 66).

According to Plaintiffs, these statements were false and misleading because the repositioning plan had not yet been implemented at the time they were made. Defendant Buettgen later stated that certain aspects of the repositioning plan were not implemented until August 2013 and that he was not as clear as he could have been during the Q3 Earnings Call. (Id. at ¶¶ 67, 95). Plaintiffs therefore contend that Defendants' Q3 2013 statements misled investors about the status of the Ruby Tuesday repositioning plan and about the extent to which that plan could be credited with the Company's guidance on future performance.

Plaintiffs also allege that Defendants "withheld the truth about Lime Fresh from investors while they were positively reporting about the Company's fast casual chain during the Class Period." (Id. at ¶ 16). Plaintiffs identify the following statements as false or misleading:

- Defendant Buettgen's statement in the Q3 2013 Earnings Call that "[Defendants] continue to make steady progress with this fast casual concept and remain excited about the potential of the brand. That said, this concept is still in its infancy and we have much work ahead of us to get the sales and profitability in line with our expectations. We will be implementing some operational changes designed to improve the concept's returns, and position the brand for future growth, which Kimberly will discuss later in the call. Our growth in the coming year will be focused in the Eastern U.S., primarily in the Florida market where the concept originated and where it has higher awareness." (Id. at ¶ 68).

- Defendant Grant's statements during the Q3 2013 Earnings Call about the actions the Company had taken to "strengthen" the Lime Fresh brand, including using menu boards and working with chefs to enhance flavors, with the goal of making "the Lime Fresh concept more competitive." Ms. Grant also remarked that Defendants "continue to nurture this brand and are encouraged by the potential it offers to create future value." (Id. at ¶ 69).

4

- Defendant Buettgen's statement in the Q3 2013 Earnings Call attributing the closure of two Lime Fresh restaurants to site-specific issues. (Id. at ¶ 70).

- Defendants' disclosures in their SEC Form 10-Q quarterly financial report, filed April 12, 2013, that net income was $2.2 million for the 13 weeks ending on March 5, 2013 and diluted earnings per share for the same period were $0.04. (Id. at ¶ 71).

- Other statements in the April 12, 2013 SEC Form 10-Q regarding Defendants' decision to purchase Lime Fresh and their belief that the chain "has the potential to generate attractive returns for us if we are able to realize our targeted revenue levels." (Id. at ¶ 72).

According to Plaintiffs, the above statements were false or misleading when made because Defendants withheld or concealed information showing that Lime Fresh had negative margins from the end of Fiscal Year 2012 through Q3 2013. (Id. at ¶ 73(a)). Plaintiffs also assert that Defendants had a duty under Generally Accepted Accounting Principles ("GAAP") to treat Lime Fresh as a separate business segment and failed to do so by lumping Lime Fresh in with Ruby Tuesday in the quarterly financial disclosures. (Id. at ¶ 73(b)).

Market analysts greeted the Q3 2013 reporting with cautious optimism. Even if estimates were adjusted upward, reports included disclaimers such as "near term results may be choppy as a more consistent long-term strategy is implemented," (Docket No. 45-7 at 2), and "the concept's core customer base will likely take a long period of convincing," (Docket No. 45-9 at 2). Nevertheless, Ruby Tuesday, Inc. stock prices rose after the alleged misrepresentations and omissions, reaching a Class Period high of $9.88 per share in intraday trading on July 18, 2013.

On July 24, 2013, Defendants reported their Fourth Quarter 2013 ("4Q 2013") and Fiscal Year 2013 ("FY 2013") results. Defendants reported that same-restaurant sales decreased by 3.1% at Company-owned Ruby Tuesday restaurants and by 5.1% at domestic Ruby Tuesday franchise restaurants. The Company also reported a net loss of $27 million for 4Q 2013, up from $6 million in 4Q 2012, which included a full impairment of the Lime Fresh goodwill ($9 million)

5

and a partial impairment of the Lime Fresh trademark ($5 million). Total revenue decreased 4.6% from the previous year. In the July 24, 2013 disclosures, Defendants treated Lime Fresh as a separate operating segment.

Ruby Tuesday's stock dropped by over 13% on the day after the July earnings announcement. Following the 4Q disclosures and stock drop, Lead Plaintiff Alaska Electrical purchased shares 15,000 shares of Ruby Tuesday common stock. On October 9, 2013, the Company made additional disclosures regarding performance during the First Quarter of Fiscal Year 2014 ("1Q 2014"). At that time, Defendants reported additional losses of $22.2 million and an 11.4% decline in same-restaurant sales for Ruby Tuesday restaurants. Stock prices dropped 17% on October 10, 2013, the day after the 1Q 2014 disclosures and the final day of the Class Period.

Plaintiffs initiated this litigation in May 2014 and the Court appointed Alaska Electrical Pension Fund as Lead Plaintiff in October 2014. (Docket No. 35). Plaintiffs filed an amended complaint shortly thereafter. (Docket No. 40) ("the Consolidated Complaint"). The Consolidated Complaint asserts a claim against Ruby Tuesday and the Individual Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. (Docket No. 40 at ¶¶ 145-49). Specifically, the Consolidated Complaint alleges that Ruby Tuesday's Third Quarter earnings disclosures contained materially false and/or misleading statements and omissions regarding the Company's repositioning plan for its Ruby Tuesday restaurants (id. at ¶¶ 60-66) and the success of its Lime Fresh restaurants (id. at ¶¶ 68-72). The Consolidated Complaint also asserts a control-person claim against the Individual Defendants under Section 20(a) of the Exchange Act. (Id. at ¶¶ 150-51). Defendants now seek to dismiss all claims. (Docket No. 43).

## II. Plaintiffs' Motion to Strike

As a preliminary matter, the Court addresses Plaintiffs' Motion to Strike. (Docket No. 51). Plaintiffs ask the Court to strike Exhibits N and O to the Declaration of Brian H. Polovoy as not integral to the Complaint and as being improperly offered for the truth. Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure, which specifically contemplates striking "redundant, immaterial, impertinent, or scandalous matter" from pleadings. Fed. R. Civ. P. 12(f); see also Fox v. Mich. State Police Dep't, 173 F. App'x 372, 375 (6th Cir. 2006). The declaration of Mr. Polovoy is not a pleading, nor do the contested exhibits to his declaration contain the type of material contemplated by Rule 12(f). Moreover, motions to strike are generally disfavored and, rather than striking material, a court may ignore inadmissible evidence. See Dunavant v. Frito Lay, 2013 WL 816673, at *5 (M.D. Tenn. Mar.5, 2013); LuJan v. Southwest Airlines Co., 2008 WL 4791490, at *6 (M.D. Tenn. Oct.28, 2008) (noting that motions to strike are disfavored, but considering plaintiff's affidavit only to the extent that it was based on personal knowledge, set forth facts which would otherwise be admissible in evidence and did not directly contradict prior deposition testimony); Berry v. Frank's Auto Body Carstar, Inc., 817 F. Supp. 2d 1037, 1041-42 (S.D. Ohio 2011) (footnote omitted) ("But motions to strike are disfavored; a Court should ignore inadmissible evidence instead of striking it from the record"). Here, the Court does not even rely on either of the contested exhibits when reaching its decision on Defendants' Motion to Dismiss. In light of this fact and considering the purpose and context of Rule 12, Plaintiffs' Motion to Strike will be denied as moot.

## III. The Pleading Standard for Securities Fraud Claims

Defendants have moved to dismiss the Consolidated Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "To survive a motion to dismiss, a complaint must contain

7

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (internal quotation marks omitted). A complaint alleging securities fraud must also satisfy the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Thus, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u-4(b)(2). Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).

As with any motion to dismiss for failure to state a claim on which relief can be granted, the Court must accept all factual allegations in the complaint as true. See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993). Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. See 5B WRIGHT & MILLER § 1357 (3d ed. 2004 and Supp. 2007). The Court must therefore determine whether the facts now before it, when viewed in the light most favorable to Plaintiffs, adequately state a claim for securities fraud.

Federal securities law makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of federal law. 15 U.S.C. § 78j(2)(b). Rule 10b-5, promulgated by the Securities

and Exchange Commission ("SEC"), specifies the prohibited acts as follows: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 420.10b-5. In order to state a claim for securities fraud, Plaintiffs must demonstrate (1) a material misrepresentation or omission by Defendants; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 469 (6th Cir. 2014). If a plaintiff fails to adequately plead any one of the above six elements, the securities fraud claim must be dismissed.

## IV. Application to Plaintiffs' Securities Fraud Claims

Defendants argue that Plaintiffs have failed to adequately plead the first, second, and fifth elements of their securities fraud claim. (Docket No. 44 at 1-2). Taking all of the facts in the Consolidated Complaint as true, the Court finds that Plaintiffs' have not adequately pleaded a material misrepresentation regarding the Ruby Tuesday repositioning plan. Plaintiffs have, however, adequately shown that Defendants omitted material information about Lime Fresh's performance and that Defendants acted recklessly in making these omissions. Plaintiffs have also shown that Defendants' material omissions caused the Class's losses, which means their claims premised upon the Lime Fresh-related omissions survive.

### A. Material Misrepresentations or Omissions

A company must "provide complete and non-misleading information" when it chooses to speak. Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir. 1998). In order to

9

recover under § 10(b) and Rule 10b-5, a plaintiff must show both an omission or misstatement and its materiality. Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 571 (6th Cir. 2008). A plaintiff establishes materiality by proof of a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 472 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988)).

A misrepresentation is an affirmative statement that is misleading or false. Such a statement may concern hard information (typically historical information or other factual information that is objectively verifiable), soft information (such as predictions and matters of opinion), or some combination thereof. In re Omnicare, 769 F.3d at 470. A court "must pull the individual statements apart to determine whether a reasonable jury could find them false or misleading." In re Omnicare, 769 F.3d at 478 (citing Zaluski, 527 F.3d at 573; City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 674 (6th Cir. 2005)). Liability does not attach to mere corporate puffery or statements of corporate optimism. In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004). Indeed, the PSLRA specifically contains a safe-harbor provision, which "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance." Helwig v. Vencor, Inc., 251 F.3d 540, 547-48 (6th Cir. 2001) (en banc) (citing 15 U.S.C. § 78u-5(i)(1)).

"An omission is actionable when disclosure of information is necessary to make the statements made, in light of the circumstances under which they were made, not misleading." Burges v. BancorpSouth, Inc., No. 3-14-1564, 2015 WL 4198795, at *4 (M.D. Tenn. July 10, 2015) (citing In re Sanofi Sec. Litig., 2015 WL 365702, at *11 (S.D.N.Y. Jan. 28, 2015); 17 C.F.R. § 240.10b-5(b)). When volunteering information, a company's disclosure "must be full

10

and fair, and courts may conclude that the company was obliged to disclose additional material facts to the extent that the volunteered disclosure was misleading." City of Monroe, 399 F.3d at 670. Put another way, securities laws require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak. Id.

Plaintiffs allege material misrepresentations falling into two buckets: 1) misrepresentations regarding the status of the plan to reposition the Ruby Tuesday brand; and 2) alleged misrepresentations and omissions regarding the performance of the Lime Fresh concept. The Court will analyze the claims in each bucket separately.

> 1. *Alleged Misrepresentations Regarding the Ruby Tuesday Restaurant Repositioning Plan*

Plaintiffs point to allegedly false or misleading statements in the Q3 2013 Press Release and Earnings Call containing both hard information (Docket No. 40 at ¶¶ 61, 62, 64, and 65) and soft information (Docket No. 40 at ¶¶ 60, 61, 63, and 66). Plaintiffs do not contend that any hard information was factually incorrect. Instead, they allege that Defendants' statements, taken together, misled investors about the financial state of the Company. Because Plaintiffs do not dispute the factual accuracy of the information presented, the Court limits its analysis to whether the information presented would have misled a reasonable investor.

Defendants clearly framed some of the soft information as predictions or "guidance" about future performance. (Docket No. 40 at ¶¶ 61, 66). Plaintiffs take issue with these predictions only to the extent that Defendants "led investors to believe that improved guest counts and flat guidance in same-store sales was [sic] a result of that [repositioning] progress." (Docket No. 48 at 4). The Court has reviewed the Q3 2013 Earnings Call transcript containing the predictions and guidance at issue. Not once do Defendants link their performance guidance to the Ruby Tuesday repositioning plan. (Docket No. 45-6 at 5, 13). They neither credit the

11

repositioning with past performance nor premise their guidance on the progress of the repositioning. The Court also notes that the guidance and predictions to which Plaintiffs point are couched in cautionary language such as "guidance," "imply," "estimated," and "expect," which puts them within the safe harbor provisions of the PSLRA. See Burges v. BancorpSouth, Inc., No. 3-14-1564, 2015 WL 4198795, at *3 (M.D. Tenn. July 10, 2015)

The other statements pertain to Defendants' representations about progress made on repositioning the Ruby Tuesday brand. Plaintiffs allege:

> Knowing that the repositioning plan was anchored in launching new, more broadly appealing menu items, as well as an aggressive marketing plan - none of which had yet been implemented - defendants nevertheless emphasized their "good progress" and led investors to believe that improved guest counts and flat guidance in same-store sales was a result of that progress.

(Docket No. 48 at 4). Plaintiffs argue that Defendants' assurances about the progress of the repositioning plan were misrepresentations because, as Defendant Buettgen later clarified, actual implementation of many aspects of repositioning plan did not begin until August 2013. Plaintiffs appear to argue that absent implementation, progress toward repositioning could not have occurred. The Court disagrees with such a narrow definition of "progress."

Defendants mentioned progress on repositioning but did not peg the progress to implementation, to a timeline, or even to specific milestones. (Docket No. 40 at ¶¶ 60, 63). Defendant Buettgen explained the market research and company goals animating the repositioning plan, (Docket No. 45-6 at 2), and shared some preliminary steps toward repositioning, such as reintroduction of the Smoky Mountain Chicken dish (id.). He also expressed general enthusiasm for the repositioning plan's potential impact. Id. Again, Plaintiffs do not attack the veracity of these statements but instead argue that they were "at least misleading" insofar as they linked Ruby Tuesday's Q3 2013 performance to the repositioning.

12

However, Defendants' statements in Q3 2013 Earnings Call included caveats and cushioning that specifically distanced Q3 performance from the anticipated changes. Defendant Buettgen stated that "it'd be a little bit premature to say that the changes we've made to date are already driving significant changes in traffic. We're moving in the right direction, but the changes have been relatively minor." (Docket No. 45-6 at 13). Thus, the facts available to the Court—and to potential investors as the time—directly contradict Plaintiffs' allegations that Defendants credited the repositioning plan with Q3 2013 performance.

Neither does Defendant Buettgen's later statement about the pace of implementation somehow render the April 2013 statements false or misleading. Again, Defendants' statements were factually correct and/or forward-looking. Defendants expressed optimism about the repositioning plan but did not but did not credit the plan with either past performance or forecasted guidance. Such statements do not become false or misleading later on merely because the optimistic projections did not come to fruition.

Plaintiffs have not sufficiently alleged any material misrepresentations regarding the Ruby Tuesday restaurant repositioning plan. To the contrary, the statements Plaintiffs identify resemble the soft, puffing, statements or predictions "upon which a reasonable investor would not rely," In re Omnicare, 769 F.3d at 472, and these statements are therefore protected by the PSLRA's safe harbor provision. Plaintiffs dispute application of the safe harbor provision, arguing that Defendants' statements were not accompanied, by meaningful cautionary language and merely provide "boilerplate" language that is insufficient to be meaningful. (Docket No. 48 at 30). "However, the PSLRA does not require companies to warn of the particular factor that ultimately causes the forward-looking statement not to come true in order to receive protection under the safe harbor provision." Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc., 22 F. Supp.

13

3d 669, 681 (E.D. Ky. 2014), aff'd sub nom., Pension Fund Grp. v. Tempur-Pedic Int'l, Inc., 614 F. App'x 237 (6th Cir. 2015) (citing In re Humana, No. 3:08-cv-00162, 2009 WL 1767193, at *12 (W.D. Ky. June 23, 2003)). Defendants' cautionary, forward-looking statements are sufficient to warrant application of the PSLRA's safe harbor provision.

Plaintiffs have failed to adequately allege that Defendants' affirmative statements regarding the progress toward repositioning Ruby Tuesday restaurants were material misrepresentations. The statements were factually correct and otherwise merit protection by the safe harbor provision of the PSLRA. Plaintiffs therefore cannot rest their securities fraud claims on those statements and the Court will dismiss Plaintiffs' claims to the extent they rely on statements regarding progress toward the repositioning plan.

*2. Alleged Material Misrepresentations and Omissions Regarding Lime Fresh*

Plaintiffs also allege that Defendants touted Lime Fresh as a growth vehicle for the Company despite knowing of and concealing Lime Fresh's poor performance and continually negative margins. (Docket No. 48 at 28-29). The Court first addresses whether any of the statements Plaintiffs identify in the Consolidated Complaint, (Docket No. 40 at ¶¶ 68 to 73), are material misrepresentations. In broad strokes, Defendants expressed their "excitement" about Lime Fresh's "growth potential." Defendants also noted that they were "nurturing" the concept, which still remained in its "infancy." As with Defendants' statements about the repositioning plan, these comments are unspecific and are framed with cautionary language such as the repeated invocation of "we believe" and "potential." Once again, this cautious optimism is protected by the PSLRA's safe harbor provision. Plaintiffs have not pleaded adequate facts to show that a reasonable investor would have relied on this soft, forward-looking puffery.

However, whether Defendants' Lime Fresh puffery was rendered misleading in light of the information Defendants *did not* disclose—namely, Lime Fresh's financial performance—is a closer question. When it comes to securities fraud claims premised on material omissions, "materiality alone is insufficient to require disclosure." Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 706 (E.D. Mich. 2010). The defendant(s) must have had a duty to disclose the information. Norfolk Cty. Ret. Sys., 22 F. Supp. 3d at 679. A duty to disclose may occur when there is insider trading, a statute requiring disclosure, or when there is "an inaccurate, incomplete or misleading prior disclosure." City of Monroe, 399 F.3d at 669. But "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." Albert Fadem Trust v. Amer. Elec. Power Co., 334 F. Supp. 2d 985, 1020 (S.D. Ohio Sep. 10, 2004). The duty to provide complete and accurate information instead requires companies to disclose the information necessary "so that what was revealed would not be so incomplete as to mislead." Norfolk Cty. Ret. Sys., 22 F. Supp. 3d at 679 (citing In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)).

Plaintiffs allege that Defendants had duty to disclose Lime Fresh's quarterly performance under GAAP. Specifically, Plaintiffs allege that under Accounting Standard Codification Topic No. 280 ("ASC 280") and SEC Regulation S-K Item 303(a)(3)(i), Defendants had a duty to treat Lime Fresh as a separate operating segment, which requires disclosure of its interim performance. Defendants do not actually dispute that Lime Fresh is a distinct operating segment that requires separate financial disclosures. Neither do they dispute that they had access to data showing that Lime Fresh's margins were consistently negative. Instead, Defendants argue that they reported Lime Fresh's disclosure at the end of Fiscal Year 2013, as was their stated policy,

and that whether a segment requires separate reporting is a judgement call. (Docket No. 44 at 17-18).

Defendants undertook to speak about Lime Fresh as an important component of the Company during their Q3 2013 disclosures. In so doing, they had an obligation to provide complete and not misleading information. Defendants presented optimistic puffery, yet withheld hard information, including Lime Fresh's consistently negative margins and the impairment of the brand's goodwill. Plaintiffs have presented sufficient facts to show by omitting known hard information about Lime Fresh's financial performance, Defendants provided incomplete and/or misleading information in the Q3 2013 disclosures. Moreover, given the gravity of Lime Fresh's financial situation, a reasonable investor would likely have found this financial information material. Accordingly, Plaintiffs have identified material omissions that may give rise to liability for securities fraud.

B. Scienter

The Court must next determine whether Defendants acted with the requisite scienter when omitting material information about Lime Fresh. In the context of securities fraud claims, scienter can be established by knowledge or recklessness. PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004) (citing Helwig, 251 F.3d 540); Grillo v. Tempur–Pedic Int'l, Inc., 553 F. Supp. 2d 809, 817 (E.D. Ky. 2008). Recklessness is defined as "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" Miller v. Champion Enters, Inc., 346 F.3d 660, 672 (6th Cir. 2003) (quoting Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979)). A plaintiff may survive a motion to dismiss only by pleading with particularity facts that give rise to a strong inference that the

defendant acted with knowledge or conscious disregard of the fraud being committed. PR Diamonds, Inc., 364 F.3d at 682 (citation omitted).

The Supreme Court has articulated a three-part test for lower courts to apply in assessing the sufficiency of a plaintiff's scienter allegations. See Tellabs, 551 U.S. at 322-23. First, a court must "accept all factual allegations in the complaint as true." Id. at 322. Second, a court "must consider the complaint in its entirety" and decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23. Third, assuming that a plaintiff's allegations create a "powerful or cogent" inference of scienter, id. at 323, a court must compare this inference with other competing possibilities. The claims should proceed "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. See also In re Omnicare, 769 F.3d at 473 (adopting this standard); Frank v. Dana Corp., 547 F.3d 564, 570-71 (6th Cir. 2008) (same).

Plaintiffs' evidence of scienter regarding the Lime Fresh omissions centers on allegations that Defendants had access to but concealed hard information about Lime Fresh's financial performance. (Docket No. 40 at ¶ 55). Defendants' pre-class statements allegedly confirm that the Company was monitoring Lime Fresh's performance, such as same-restaurant sales and earnings margins, independently that of Ruby Tuesday restaurants all along. (Docket No. 40 at ¶¶ 49-50). Plaintiffs argue that this concealment demonstrates scienter in two ways. First, Defendants allegedly disclosed helpful information (puffery about Lime Fresh's growth potential) while withholding negative information about Lime Fresh's performance. This partial disclosure, Plaintiffs argue, reflects Defendants' efforts to mislead investors. Second, Plaintiff

17

argue that the failure to treat Lime Fresh as an independent reporting segment violated GAAP, and a GAAP violation can support an inference of scienter. According to Plaintiffs, Defendants only reported Lime Fresh separately at the end of Fiscal Year 2013, when their financial statements would be subject to outside audit. Defendants do not offer a competing inference for why the Company withheld Lime Fresh's financial information. Instead, Defendants merely assert that whether to aggregate or report segments separately is a difficult judgment call.

The Court finds that, taken together, Plaintiffs' allegations present a cogent inference that Defendants acted with the requisite scienter. As discussed in Section IV.A.2, *supra*, Plaintiffs have presented adequate facts to show that withholding Lime Fresh's financial performance constitutes a material omission. Common sense dictates that disclosing the good while withholding the bad, especially when the bad is so readily known, suggests deliberate concealment. And while GAAP violations do not alone support a finding of scienter, the failure to report Lime Fresh as a separate operating segment compounds Defendants' already-suspicious decision to disclose only positive puffery. The Court is persuaded by the facts now on the record that a reasonable person would have recognized the obvious danger in withholding information about Lime Fresh's poor performance. Put another way: looking at the Consolidated Complaint holistically, the Court finds that Plaintiffs' allegations give rise to a more compelling inference of recklessness than do Defendants' deflections regarding the tough judgment calls they faced. Plaintiffs have adequately pleaded scienter with respect to Defendants' Lime Fresh omissions.

  C. <u>Loss Causation</u>

In any private action under the federal securities law, the plaintiff has the burden of proving that the act or omission of the defendant alleged to violate the securities law caused the loss for which the plaintiff seeks to recover damages. 15 U.S.C. § 78u-4(b)(4). Loss causation

requires 'a causal connection between the material misrepresentation [or omission] and the loss.'" Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 920 (6th Cir. 2007) (citing Dura Pharms, Inc. v. Broudo, 544 U.S. 336, 342 (2005)). Thus, the Court must determine whether Plaintiffs have alleged sufficient facts to show that Defendants' July 2013 disclosure regarding Lime Fresh's poor performance caused their alleged loss.

Plaintiffs allege Defendants finally disclosed Lime Fresh's negative margins and the impairment of its goodwill on July 24, 2013, as part of its 4Q 2013 and Fiscal Year 2013 SEC filings and the corresponding press release. (Docket No. 40 at ¶ 79). The next day, July 25, 2013, Ruby Tuesday stocks dropped almost 14%. (Docket No. 48 at 32). Plaintiffs make no other arguments about how the Lime Fresh omissions caused additional losses after July 25, 2013. Their arguments regarding loss incurred during the remainder of the Class Period are cabined to Defendants' subsequent disclosures regarding the repositioning plan.[2]

The Court finds that Plaintiffs have adequately pled loss causation by showing that the stock price dropped when the information concerning Lime Fresh's financial performance was first disclosed. The Consolidated Complaint sufficiently alleges that the information in the July 24, 2013 announcement was enough to affect the market and stock price in a negative way. However, the Court agrees with Defendants that Alaska Electrical, the Lead Plaintiff, cannot itself show causation. Alaska Electrical did not purchase Ruby Tuesday stock until July 25, 2013, the day *after* the corrective Lime Fresh disclosures. Any harm to Alaska Electrical simply cannot be attributed to Defendants' Lime Fresh omissions. Accordingly, Plaintiffs will need to identify a new Lead Plaintiff.

---

[2] Again, Because Plaintiffs' claims premised on the repositioning plan are no longer operative, the Court's analysis is limited as to whether the facts sufficiently show that the Lime Fresh disclosures on July 24 caused Plaintiffs' alleged harm.

D.  Individual Liability Under Section 20(a)

Liability under Section 20(a) is contingent on the class's ability to prove a primary violation under Section 10(b).  PR Diamonds, 364 F.3d at 696; Humana, 2009 WL 1767193, at *17.  Because of the above-stated holdings, the Consolidated Complaint's Section 20(a) allegations with regard to forward-looking statements about the repositioning plan are dismissed and the Consolidated Complaint's Section 20(a) allegations with regard to the material omissions regarding Lime Fresh's performance are sufficient to survive this motion to dismiss.  See Burges, 2015 WL 4198795, at *7.

V.  **CONCLUSION**

For the above-stated reasons, Plaintiffs' Motion to Strike will be denied and Defendants' Motion to Dismiss will be granted in part and denied in part.  A separate order shall enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE